MEMORANDUM OF DECISION
CT Page 9824
On December 3, 1999, the Department of Children and Families, hereafter "DCF," filed a petition for the termination of the parental rights of Shearon B. and Morris J., to their daughter, Nateka, born on June 1994. DCF alleges that neither Shearon nor Morris have achieved such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering Nateka's age and needs, they could assume a responsible position in her life. Connecticut General Statutes § 17a-112
(j)(3) (B1). In addition, DCF alleges that Nateka has been abandoned by her parents in the sense that they have failed to maintain a reasonable degree of interest, concern or responsibility as to her well being. Connecticut General Statutes § 17a-112 (j)(3)(A). DCF further alleges that there is no ongoing parent child relationship between Shearon and Nateka. Connecticut General Statutes § 17a-112 (j)(3)(D).
The court finds that notice of this proceeding has been provided in accordance with the Practice Book and this court has jurisdiction. Although respondent father appeared for trial with his court appointed attorney, respondent mother did not appear. She was, however, vigorously represented by court appointed counsel, who participated in each step of the proceeding. The court further finds that no action is pending in any other court affecting the custody of Nateka and that reasonable efforts have been made to locate the mother. The court was presented with twenty-one full exhibits and heard the testimony of the social workers, the court appointed psychologist, as well as Nateka's foster father.
1. FACTS
A. Events Prior to Nateka's Move to Connecticut.
Shearon is the biological mother of four children and is currently twenty-eight years old. She was born in New York City on September 4, 1973. She remained in New York throughout her childhood, adolescence, and early twenties. According to the evidence presented to the court[2], a mother who abused drugs and would often use the drugs in front of her raised Shearon. Her father, an alcoholic and a drug abuser died when Shearon was ten years old. She dropped out of school in the ninth grade. In 1988, at the age of fifteen, she delivered her first child, Tiffany. Unable to meet this child's needs, Tiffany was placed in the care of the child protection authorities in New York and freed for adoption.
Tragically for Shearon, at the age of sixteen she was introduced to illegal drugs by one of her aunts. It was the beginning of a life long struggle that has robbed her of the freedom necessary to make healthy CT Page 9825 choices. In an effort to maintain her habit, she sold everything she owned, including her body. Her Connecticut criminal record includes several convictions for prostitution.[3] In 1992, while engaged in this life style, she met Nateka's biological father, Morris. Morris was forty-one at the time and according to New York State Department of Correction Services computer system, he was in State custody as an inmate at the Mohawk Facility from January 13, 1992 through April 27, 1992.[4]
He returned to State custody as an inmate at the Hudson Facility on June 5, 1992 and remained there until February 8, 1993. He was then transferred from the Hudson facility to the Eastern facility, where he remained until he was released from State custody on April 14, 1994. It was on June 6, 1994, that his daughter, Nateka was born.
On June 1, 1995, a few days before her daughter's first birthday, Shearon left Nateka in the care of an unrelated male while she tended to her addiction. The New York Child Protective Services removed Nateka and placed her in foster care. In an effort to obtain recommendations for placement options for Nateka, the agency arranged for Virginia Khoury, MD, a consulting Child and Adolescent Psychiatrist associated with the Parsons Child and Family Center in New York, to evaluate the child.
Fortunately for Nateka, her biological father was interested and concerned enough to accompany her on this evaluation. He provided background information to Dr. Khoury to assist her in making recommendations to the agency.[5] He reported an interest in obtaining custody of his daughter. Since the interaction between father and daughter was positive during this evaluation, Dr. Khoury recommended that the Child Protective Services Agency consider the father as an appropriate placement for Nateka. However, the doctor cautioned that prior to any placement, an evaluation of the appropriateness of such a placement, including a determination of the daycare arrangements, be performed.
The court heard the testimony of the Respondent father. Regarding the June 1, 1995 incident, he testified that he took care of Nateka while Shearon served time in jail due to the abandonment of Nateka. He stated that he was very interested in obtaining custody of Nateka and actually did become Nateka's caretaker for a time during Shearon's incarceration.
B. Events Following Nateka's Move to Connecticut
Morris testified that he took care of Nateka in New York until sometime in June of 1996 when he sent Nateka to an unrelated caretaker in Connecticut, Mrs. Mc. He remained in New York. Little is known about Nateka's stay with Mrs. Mc. On November 6, 1996, Morris was incarcerated in New York for violation of his parole. He remained in state custody CT Page 9826 until he was released on June 19, 1997.[6]
After Shearon completed her term of incarceration for the abandonment of Nateka in 1995, she moved to Connecticut. It is unclear whether or not Nateka was still with Mrs. Mc. or with her mother during this time. What is undisputed is that on August 1, 1996, Shearon was arrested and charged with prostitution in Connecticut. According to Shearon's Connecticut criminal history, one week later, on August 7, 1996, Shearon was arrested a second time for prostitution and possession of narcotics.[7] On November 14, 1996, Shearon was convicted for both of these arrests. The sentence imposed for each conviction was one year suspended after serving ninety days in jail. Each sentence was to run consecutive, making the total effective sentence two years suspended after serving one hundred eighty days. For Nateka, this meant that, not only was her father unavailable due to his incarceration in New York, but her mother was unavailable as well. She was, therefore, to remain in the care of unrelated caretakers until one or both of her parents were released.
Upon her release from incarceration in January 1997[8], Shearon went to the home of Nateka's caretaker, Mrs. Mc, picked up Nateka and moved in with Ms. D. The evidence shows that she lived with Ms. D. for a short while and in early 1997, left and relocated herself and Nateka to a shelter.[9] On March 20, 1997, she and Nateka left the shelter. She returned to Ms. D's home, left Nateka in her care and promised to be right back. Since she had not returned to the shelter by three thirty in the afternoon of the following day, the shelter staff called the DCF Hotline. They were concerned about Nateka's safety and well being.
On March 21, 1997, a DCF social worker was assigned to investigate the referral and an administrative decision was made to invoke a ninety-six-hour hold. Nateka was placed in foster care. On March 25, 1997, the Court (Potter, J) entered an Order of Temporary Custody and assigned the case for a preliminary ten-day hearing on April 4, 1997. According to the DCF narrative as well as the testimony, Shearon called DCF on March 24, 1997 and on April 3, 1997. To her credit, she called to inquire about Nateka and to inform DCF that she was unable to care for her daughter at this time because she was planning on leaving the state. She asked DCF to look into placing Nateka with a relative. She also asked for a visit, which was set up for April 7, 1997 at the DCF office. The record indicates that she did not appear for that visit. This was to be the first of many disappointments little Nateka would have over missed visits with her parents.
As soon as Morris discovered that his daughter was in foster care, he wrote a letter to DCF. He communicated his willingness to care for his daughter upon his release from jail and as evidence of that on May 6, CT Page 9827 1997, he signed a three-month service agreement.[10] The terms of the agreement required Morris to comply with several expectations, including, attending parenting classes and substance abuse evaluation, if available in prison. If the classes were not available in prison, Morris agreed to comply with the requirements upon his release from prison. In addition, he agreed to maintain contact with Nateka through letters. The agreement was to be effective starting on April 28, 1997 through July 28, 1997.
By June 23, 1997, DCF was considering Morris as "the more possible reunification plan" for Nateka's permanency.[11] In furtherance of this plan, DCF arranged for Nateka to visit her father as soon as Morris reported his release from jail. The record indicates that the first visit occurred on June 25, 1997. Shearon was also present at this visit and she stated that she and Morris were planning on reconciling as a couple and were currently living together.[12] Morris expressed an interest in doing whatever was necessary to reunite with his daughter. As a further demonstration of his interest, he attended a case status conference in court on July 16, 1997 with his attorney and signed written expectations in which he promised to comply with DCF requirements.[13] The plan was to return Nateka to her father under protective supervision if Morris complied with the expectations. The plan also included moving Nateka into the home of a relative as soon as possible.
Nateka continued in the non-relative foster home for five additional months until August 6, 1997. On this date she was moved to the home of Morris' brother, her paternal uncle and aunt, Mr. and Mrs. T. This family expressed an interest in becoming a long-term placement resource for Nateka. Regrettably, a permanent placement with this family would not be an option for Nateka. A number of issues concerning Nateka's best interest surfaced while she was in this relative foster home. On one occasion Nateka stated that Mrs. T had pushed her. On another occasion, DCF was informed that Nateka was discharged from her therapy because the relatives were unable to keep up with the appointments.
As a result of this, as well as the concern over the deterioration of Nateka's appearance while in this home, a call was made to the DCF Hotline. An investigation was made and the issue was discussed with Mrs. T. As a result of those discussions, the decision was made to once again move Nateka. Eight months later on April 22, 1998, Nateka was removed from the home of her relatives and returned to the care of her former non-relative foster mother.
While all of this change and unrest was taking place in three and a half year old Nateka's life, and despite the promise to do whatever was necessary to reunite with her, her parents had maintained very little CT Page 9828 contact with her. Reports of domestic violence between Shearon and Morris surfaced in August of 1997. In October of 1997, Shearon was observed with a black eye by the DCF social worker. According to the evidence, Morris admitted that he caused the black eye but he and Shearon minimized the violence, describing it as play or as an accident.
During the fall of 1997, visits with Nateka were missed or canceled by both Morris and Shearon. Shearon was arrested again on September 1, 1997 for Prostitution and on November 15, 1997, for Possession of Narcotics and Breach of Peace.[14] She was convicted of these charges on December 4, 1997 and sentenced to a six-month period of incarceration on the Prostitution charge and thirty days on the Breach of Peace charge. The sentences were to run concurrent to one another. Morris was arrested on January 9, 1998 for Sale of Narcotics and on March 31, 1998 was convicted on that charge and sentenced to three years incarceration.
Once again, Nateka's parents were physically and emotionally unavailable to meet her needs. She was being asked to wait until her parents could work out these difficulties in their life before she could begin to experience some sense of family and connection with them. On March 11, 1998, Nateka was transported to the jail to visit with her mother and as a tribute to her resilience, Nateka was able to reconnect with her mother. Because of her own tragic circumstances, however, Shearon was unable to offer a plan for reunification with Nateka. Although she expected to be released within the next few months, her plans did not include becoming her daughter's primary caretaker. She asked that Nateka be returned to New York and placed with Shearon's mother.
As stated earlier, Nateka was moved back into a non-relative foster home on April 22, 1998. The evidence before the court is that Nateka readjusted well to the return to this foster home. As soon as Shearon was released from jail, visits were scheduled for her and Nateka. Shearon failed to attend any of the scheduled visits. She did, however, attend an Administrative Case Review at the DCF office on July 13, 1998. She reported that she was pregnant and interested in obtaining treatment for her addiction.
The Court heard the testimony of Debra Mansfield, the DCF social worker assigned to this family in July of 1998. Ms. Mansfield testified that on September 2, 1998, Shearon called her and reported that she had "signed herself into the Stonington Institute because she had been smoking crack for three days in a row." By September 22, 1998, however, efforts were being made to locate other providers of inpatient treatment services for cocaine users. The insurance coverage was scheduled to lapse on October 1, 1998 and Shearon would have to leave the Stonington Institute on that day. CT Page 9829
Ms. Mansfield was successful in obtaining inpatient treatment for Shearon at the Crossroads Program in New Haven. She entered the program in October of 1998 and remained in their care until March of 1999. She delivered a baby girl on December 21, 1998 while an inpatient resident at Crossroads. The evidence establishes that Nateka visited once with her mother at Crossroads in early December, several weeks prior to the birth of her new sister. The evidence further indicates that the visit went well and Nateka did not want to leave her mother on that date.
On December 14, 1998, Nateka visited with her father at the correctional facility in which he was imprisoned. Morris requested that DCF place his daughter with his sister in New York. DCF began the necessary paperwork to look into this possible relative placement. Initially, the placement looked promising, but unfortunately for Nateka, the relative was unable to follow through with the requirements necessary to finalize the placement.
Shearon was discharged from Crossroads in March of 1999 due to a relapse.[15] According to the records and the testimony, Shearon left Crossroads with her newborn for a weekend pass. She left the infant with her friend's mother while she went out to indulge her addiction. Crossroads made a referral to the DCF Hotline and the newborn was removed pursuant to an Order of Temporary Custody. Nateka has not seen her mother since her visit in December of 1998.
The Court heard the testimony of Kelly F. Rogers, Ph.D, a clinical psychologist and the Court appointed evaluator. Dr. Rogers testified that he evaluated Morris and Nateka on April 15, 1999[16] and on February 13 and 20, 2001.[17] He did not evaluate Shearon; he did however, evaluate the relationship between Nateka and her foster parents. In his evaluation of April 15, 1999, Dr. Rogers found that father and daughter shared a bond and that Morris was Nateka's psychological father. He observed that Morris was clearly interested in his daughter. He was concerned however, over Morris' failure to accept any responsibility for Nateka's legal status as a foster child.
Dr. Rogers further recommended that once Morris was released from jail, DCF should increase visitation between Nateka and her father. Dr. Rogers also recommended as follows:
 "Consistency is a key problem in the evaluee's relation with his daughter. If he can maintain the allowable schedule of visits, refrain from illegal activity and establish and maintain employment and housing over a period of at least one year, it may be CT Page 9830 appropriate to consider reunification . . . In consideration of the child's age and her need for a reliable and stable home, should Mr. J fail to maintain the efforts . . . termination of parental rights should be pursued."
During the remainder of 1999, while Morris remained incarcerated, five-year old Nateka traveled to the jail to visit him once a month. Since Shearon's whereabouts were unknown once she left Crossroads, visits with her were impossible for little Nateka during the remainder of 1999. Nateka was forced to summon every possible skill available to a five-year old to deal with the disappointment of wanting to be with a mother that could, or perhaps more accurately would, not choose to be with her. Shearon was compelled to choose her addiction over anyone or anything.
Nateka continued to visit with her father at the jail until his release on August 4, 2000. After his release, he maintained contact with his daughter at visits scheduled to occur every other week. Despite his expressions of interest in his daughter, he missed several visits with her in 2000 and 2001.[18] In addition to missing visits, Morris was unable to obtain housing appropriate for himself and Nateka. He returned to live in the home of his brother from where Nateka had been removed. He remained in his brother's home until March 1, 2001, when he moved into his own apartment.
C. Events following Nateka's move to her present non-relative foster home.
The court heard the testimony of Nateka's foster father, Mr. JLM. He testified that Nateka moved into his home in July of the year 2000. He and his wife share their home with Nateka, Nateka's two-year-old half sister and a one-year old child. He testified that when Nateka first moved in he noticed her difficulties, but she quickly became comfortable in her new home. She enjoys being a part of the family and especially enjoys being with her sister. She is in therapy where she has been identified as a happy child, always smiling. She has also started school and is doing well. JLM testified that he comes from an extended family of ten brothers and the entire family loves Nateka. They are all looking forward to becoming her permanent family.
2. ADJUDICATION
A. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court CT Page 9831 finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Connecticut General Statutes §17a-112 (j)(1). In its petition, DCF alleges that it has made reasonable efforts to locate Shearon. DCF also alleges that it has made reasonable efforts to reunify Nateka with her biological parents, but that they are unable or unwilling to benefit from reunification efforts.
In this case, the court finds by clear and convincing evidence, that DCF made reasonable efforts to locate the mother. As stated earlier, although she did not appear for the trial, she was represented by counsel during the entire proceeding. The court further concludes by clear and convincing evidence that DCF made reasonable efforts to reunify Nateka with her parents and that they are unable and unwilling to benefit from reunification efforts.
As far as Shearon is concerned, the court finds by clear and convincing evidence, that her unwillingness to benefit is demonstrated by her inability to complete a substance abuse rehabilitation program or to refrain from involvement with the criminal justice system. She also has no insight into the needs of her young daughter as far as maintaining contact and bonding is concerned. Shearon has been unable to apply any lessons learned from her life experiences to demonstrate that she could become a consistent parental figure in the life of her daughter.
The court finds, by clear and convincing evidence that Morris is unable and unwilling to benefit from any further reunification efforts. Despite the fact that Morris has been incarcerated for most of the time that DCF has been involved with his daughter, the agency made reasonable efforts to reunify him with his daughter. Efforts were made to maintain the connection that he had with Nateka by the immediate scheduling of visits upon his release from jail. In addition, Nateka was taken to the jail to visit and stay in touch with her father.
Like Shearon, Morris has no insight into the needs of his daughter. The court does not doubt that when he states that he loves his daughter, he believes that he does love her. The court also does not doubt that when he testifies that he had to sell drugs to earn money to take care of Nateka, he believes that this is what he must do. The court, however, does not believe that this is the case. The court is clearly convinced that given Morris' lack of insight regarding the needs of his young daughter, he is unable and unwilling to benefit from reunification efforts.
B. Adjudication
 1. Shearon
CT Page 9832
a. Failure to Rehabilitate
The court finds, by clear and convincing evidence that Shearon is the parent of a child that has been previously adjudicated a neglected child and that she has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Nateka's age and needs, she could assume a responsible position in her life. Connecticut General Statutes § 17a-112
(j)(3) (B1)
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence that the level of rehabilitation [he] has achieved, if any falls short of that which would reasonably encourage the belief that at some future date [he] can assume a responsible position in [his] child's life." (Citations omitted; internal quotation marks omitted.) In re Eden F., 250 Conn. 674, 706, 741 A.2d 873(1999) The inquiry for the trial court was whether the respondent achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ." General Statutes (Rev. to 1997) § 17a-112. This inquiry required the court to obtain a historical perspective of the respondent's child caring and parenting abilities. In re Galen F,54 Conn. App. 590, 594, 737 A.2d 499 (1999).
The court finds that Shearon has never played a useful or constructive role in Nateka's life. She has not provided for any of Nateka's basic needs. Despite being provided with opportunities to "slay the dragons that haunt her", such as drug addiction, she has been unable to consistently apply herself to any meaningful rehabilitation efforts. The court finds that Shearon has not achieved any degree of rehabilitation.
Next, the court looks at whether or not the parent could achieve a level of rehabilitation within a reasonable time to encourage the belief that the parent could play a meaningful role in the life of the child. The court concludes, based on clear and convincing evidence that Shearon could not achieve any level of rehabilitation, within a reasonable time, that would allow her to play a meaningful role in her little seven-year old's life. Nateka is just starting school, an important milestone in her life. She needs consistency and safety, along with her basic human needs CT Page 9833 of food, shelter and clothing. Unfortunately, Shearon is not in a position now to meet her daughter's needs nor is it reasonable to believe that she will be within the foreseeable future.
b. Abandonment
Since our Supreme Court's pronouncement in State v. Anonymous,179 Conn. 155, more than twenty years ago, our state's appellate case law has further shaped and circumscribed the meaning of abandonment. "Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [section 17a-112 (c)(3)(A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . ."
"Section [17a-112 (c)(3)(A)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." (Citations omitted; internal quotation marks omitted.) In re Shane P. 58 Conn. App. 244, 255, ___ A.2d ___, (2000)
The court finds by clear and convincing evidence that Shearon abandoned Nateka within the meaning of the statute.
c. No ongoing parent child relationship
General Statutes (Rev. to 1999) § 17a-112 (c)(3)(D), now (j)(3)(D), provides that a court may grant a petition to terminate parental rights if it finds by clear and convincing evidence that "there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. . . ."
"This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the CT Page 9834 future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. . . . In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . Feelings for the natural parent connotes feelings of a positive nature only." (Citations omitted; internal quotation marks omitted) In re Jonathan G.63 Conn. App. 516, ___ A.2d ___ (2001).
The court finds by clear and convincing evidence that no parent-child relationship, within the meaning of the statute, exists between Nateka and Shearon. The court further concludes, by clear and convincing evidence that it is not in Nateka's best interest to allow time for such a relationship to develop. The last time that Nateka saw her mother was on December 14, 1998. Nateka was four and a half years old at the time. On the first day of the trial on this matter, Nateka was three months shy of her seventh birthday. She has had no contact with her mother for over one-third of her young life. The court concludes that the separation is too long and to attempt to introduce another parental figure into Nateka's life would be detrimental to her best interests.
2. Morris
 a. Failure to Rehabilitate
The court finds, by clear and convincing evidence that Morris has failed to rehabilitate within the meaning of the statute. The court credits his attempts to learn how to parent his daughter by attending parenting classes during his period of incarceration. The court considers it noteworthy that Morris did receive a Perfect Attendance Award[19]
for his participation in this class. In addition, the court credits the fact that Morris completed nine hours of substance abuse programming while incarcerated. Hopefully, he has acquired skills necessary to make healthy choices that will assist him in managing his life in the future. "This court recently explained that in assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue." In re Sarah AnnK., 57 Conn. App. 441, 448, ___ A.2d ___ (2000)
As stated previously, Nateka is a little seven-year old girl who needs stability and consistency in her life. She is about to begin school and because of the chaotic life style of her father as well as her mother, she has to include in her schedule of activities, time for therapy. Hopefully this therapy is helping her cope with the issues of loss and abandonment that she faces and inevitably will continue to face. Unfortunately for Nateka, Morris' efforts to rehabilitate himself were CT Page 9835 not enough to overcome his parental deficiencies. According to Dr. Rogers' report of the interaction between Nateka and her father in February 2001,[20]
 "He was underactive throughout the visit, and did not seek out the child's level in proximity or activity; instead prompting her to come to him. The father seemed to understand his daughter well, although he occasionally over-estimated her ability and/or understanding. He was somewhat pedantic and tended to over-correct and micromanage her activity. She responded with mild, albeit indulgent annoyance."
The court concludes that Morris has failed to rehabilitate.
The court further finds that it is not foreseeable that Morris could assume, within a reasonable time, considering Nateka's age and needs, a responsible position in the life of his daughter. The court further finds that this is demonstrated by Morris' extensive criminal history, his inconsistency in maintaining contact with his daughter, his psychological profile as well as his lack of insight into the needs of his daughter. It would not further Nateka's best interest to allow Morris additional time to attempt to rehabilitate.
b. Abandonment
The court finds by clear and convincing evidence that Morris' history of abandoning Nateka started early in her life. Although the evidence indicates that he took care of eleven-month old Nateka after her mother abandoned her in 1995 in New York; it was shortly after that he shipped her to a non-relative in Connecticut while he remained in New York. It is true that Morris has spent much of his adult life in jail. He was not incarcerated, however, at the time he took custody of Nateka in 1995 in New York. He did not lose his freedom again until November 1996 when he was returned to state custody for violation of his parole status. There is no credible reason to explain why Nateka had to endure a separation from her father and be cared for by a non-relative during this time that her father was not in jail.
Morris abandoned Nateka again when he failed to maintain consistent contact with her when he returned to Connecticut in June 1997. Despite his agreement in writing,[21] to cooperate with DCF's plan to reunify him with his daughter, he failed to do so. Morris' failure to maintain consistent contact during this time is without excuse, given that his daughter was placed in the home of his brother during this time at his request. In addition to failing to visit while he was at liberty to do CT Page 9836 so, he chose to continue his involvement with the criminal justice system, resulting in the loss of his freedom to maintain uninterrupted contact due to his subsequent incarceration. As stated earlier, Morris was convicted for sale of narcotics in January 1998 and sentenced to three years in prison in Connecticut. The court finds that the level of interest that Morris has had in his daughter is inconsistent and sporadic. He has not maintained a reasonable degree of interest in her well being. "Maintain implies a continuing, reasonable degree of concern." In re Shane, supra, 58 Conn. App. 244, 251. The court finds by clear and convincing evidence that Morris abandoned Nateka within the meaning of the statute.
3. REQUIRED FINDINGS
In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the repondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in section 17a-112 (d). In reTyscheikcka H., 61 Conn. App. 19, 26, ___ A.2d ___ (2000).
1. Finding regarding the timeliness, nature and extent of services offered, provided, and made available to the parent and the child by a child-placing agency to facilitate the reunion of the child with the parent.
As stated previously, the court finds that DCF provided services to both of the parents in the form of case management coordination, substance abuse treatment and counseling, and visitation coordination. Moreover, the Court has previously concluded that both Shearon and Morris were unable and unwilling to benefit from services for reunification with Nateka.
2. Finding regarding whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.
As stated previously in this opinion, the court finds that DCF made reasonable efforts to reunify Nateka with her parents.
3. Finding regarding the terms of any applicable court order entered into and agreed upon by any individual or child-placing agency and the parent, and the extent to which all parties have fulfilled their obligations under such order. CT Page 9837
As stated previously, both Shearon and Morris agreed to cooperate with DCF. Morris signed a service agreement while still incarcerated, as well as a set of expectations. Morris signed the expectations on July 16, 1997. The court finds that the expectations were reasonable and Morris failed to comply. Shearon was also provided with a set of reasonable expectations, which she did not meet.
4. Finding regarding the feelings and emotional ties of the child with respect to the child's parents, any guardian of the child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
After not seeing her mother for two and a half years, Nateka has very little memories of her mother. She does have memories of her father, since she has had more contact with him. In his March 12, 2001 report[22]
Dr. Rogers opined that "Nateka clearly recognized Mr. J as a familiar figure, and she appeared reasonably comfortable in his presence . . . Nateka was clearly interested in her father but responded to him more as a visiting resource, than as a parent." On the other hand, the evidence is clear that Nateka has developed very strong connections with her foster parents, who want to adopt her and give her a permanent and stable home. Nateka also has expressed her desire to permanently stay with her foster parents.
5. Finding regarding the age of the child.
Nateka was born on June 1994. She is seven years old.
6. Finding regarding the efforts the parent has made to adjust such parent's circumstances, conduct or conditions to make it in the best interest of the child to return the child to the parent's home in the foreseeable future, including, but not limited to: (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent; provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
The court finds that Shearon has not made any efforts to adjust her circumstances to make it in Nateka's best interest to be returned to her care. She has never played a meaningful role in the life of her daughter. She has not maintained contact with Nateka or with DCF. Morris, on the other hand, has attempted to have some contact with his daughter. As stated previously, however, this contact has been inconsistent. Starting when Nateka was barely one year old, Morris sent CT Page 9838 her away from him and into the care of an unrelated person who resided in Connecticut. He has continued in a lifestyle that has led him to lengthy periods of incarceration. The court finds that he has not adjusted his circumstances to make it in Nateka's best interest to be returned to his care.
7. Finding regarding the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person or by the economic circumstances of the parent.
Neither parent has been prevented from maintaining a meaningful relationship with the children by the unreasonable act or conduct of the other parent, or the unreasonable act of any other person or by the economic circumstances of the parent.
4. DISPOSITION
"Conducting a best interest analysis is not a narrow concept restricted to a compelling reason or to fully reuniting the parent with the child. Rather, it is purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations." (Internal quotation marks omitted) In re Alissa N., 56 Conn. App. 203, 208, 742 A.2d 415
(1999). The court has considered all the relevant factors.
The court finds based upon the testimony and evidence presented that it would be in Nateka's best interest to terminate the parental rights of Shearon B. and Morris J. These findings are made after considering Nateka's sense of time, her need for a secure and permanent environment, the relationship that she has developed with her foster parents who wish to adopt her, as well as the totality of the circumstances.
5. ORDERS
Based upon the foregoing findings, the court determines that it is in Nateka's best interest to terminate the parental rights of her biological parents. It is accordingly, ORDERED that the parental rights of Shearon B. and Morris J. are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent of Nateka to secure a permanent home for Nateka. DCF is hereby ordered to give serious consideration to Nateka's present foster parents as that permanent home. A permanency plan shall be submitted within thirty days. A review plan shall be filed in accordance with State and Federal law. CT Page 9839
Judgment may enter accordingly.
BY THE COURT
Carmen L. Lopez, Judge Child Protection Session